## HAWLEY v. HAWLEY.
### No. 7457.

United States Court of Appeals for the
District of Columbia.
Decided Aug. 5, 1940.

William A. Gallagher and Dean Hill Stanley, both of Washington, D.C., for appellant.

Raymond M. Hudson, Minor Hudson, and Geoffrey Creyke, Jr., all of Washington, D.C., for appellee.

Before MILLER, EDGERTON, and VINSON, Associate Justices.

MILLER, Associate Justice.

On August 27, 1929, letters testamentary were issued to appellant, as executrix under the will of Charles A. Hawley. On the preceding day, pursuant to the order of the Probate Court, she and Fidelity and Deposit Company had executed a general

747

bond, in the form required by the District of Columbia Code,[1] and in the penal sum of $30,000, conditioned upon the faithful administration of the estate. On December 15, 1930, the court approved a special bond in the sum of $6,000, in lieu of the general bond, by the terms of which appellant and her surety undertook to pay "all the debts of and just claims against the said testator and all damages which shall be recovered against her as Executrix" and in all things to "abide by and perform such judgment or decree as the Court may make in the premises." On November 8, 1938, appellee sued appellant in the court below on the special bond to recover the value of a note, executed by the testator, which had become due on March 1, 1930. This appeal is from a judgment in favor of appellee.

■ Appellee moved to dismiss the appeal, contending that notice thereof had been filed too late. The motion to dismiss was denied by this court without opinion on August 2, 1939; but on oral argument the contention was renewed and submitted by both parties on briefs. The record shows that judgment was entered by the lower court on May 5, 1939; and on May 15, 1939, appellant filed therein a motion for new trial, and a motion to vacate judgment and stay proceedings. Both were denied on June 12, 1939. Notice of appeal was filed on June 16, 1939. The question presented by appellee's motion to dismiss is concluded by our decision in Burke v. Canfield,[1a] to which we adhere.

■ We come then to the merits. Appellant contends that the statute does not permit recovery on a special bond, until the debt or claim sued upon has been recovered against appellant, as executrix, in a separate action. Support for this contention is said to be found in the provision permitting the filing of special bonds, which provides: "If the executor is the residuary legatee of the personal estate of the testator, or provided the residuary legatee of full age shall notify his consent to the court, he may, instead of the [general] bond prescribed as aforesaid, give bond with security approved by the court, and in a penalty prescribed by the court, *conditioned to pay all the debts and just claims against the testator, and all dam-*

*ages which shall be recovered against him as executor, and all legacies bequeathed by the will,* in which case he shall not be required to file any inventory or render any account. And if such bond be given by the executor, he shall be answerable for *the full amount of all debts, claims, and damages that may be recovered against him as executor as if he were sued in his own right,* and any legatee may recover the full amount of his legacy in a suit on the executor's bond or in equity, and the giving of the bond shall be considered an assent to the legacy: Provided, That the surety or sureties in said bond shall not be liable for a greater amount than the penalty thereof." (Italics supplied)[2]

It is clear from the language first italicized that appellant undertook, by the special bond, to pay (1) all debts and just claims against the testator; (2) all damages which should be recovered against her as executrix; and (3) all legacies bequeathed by the will. She contends now—relying upon the language last italicized—that the statute requires, as a condition of recovery against the special bond, a previous recovery against her as executrix, not only as concerns damages, but debts and claims as well. But the language last italicized must be read with the language first italicized. When so read, it will not support appellant's contention. No more will the language of the special bond itself. It, too, provides that appellant "shall pay [1] all the debts of and just claims against the said testator and [2] all damages which shall be recovered against her as Executrix." (Numbers in brackets supplied)

■ It is next contended that the action on the bond was barred in any event by the provisions of Section 87, Title 29, of the District Code. That section provides, in part, as follows: "* * * No creditor shall be entitled to maintain an action on a testamentary or administration bond for any claim against a testator or intestate until, when practicable, an action has been commenced against the executor or administrator of the deceased and a summons issued therein has been returned 'Not to be found,' or a writ of fieri facias or of attachment, issued on a judgment against such executor or administrator, has been returned 'nulla bona,' or until such ap-

---

[1] D.C.Code (1929) tit. 29, § 131.

[1a] —— App.D.C. ——, 111 F.2d 526, decided April 17, 1940. Accord: Neely v.

Merchants Trust Co., 3 Cir., 110 F.2d 525.

[2] D.C.Code (1929) tit. 29, § 133.

parent insolvency of the executor or administrator or insufficiency of his effects as in the judgment of the court before which such action may be tried shall show the said creditor to be without remedy except by such action on the executor's or administrator's bond."

Properly applied, these requirements are intended to govern actions on general bonds and the administration of estates as normally conducted. This process of administration involves the collection, management, and distribution of the estate; including "the legal proceedings necessary to satisfy the claims of creditors, next of kin, legatees, or whatever other parties may have any claim to the property of a deceased person." [3] On the other hand, where, as in the present case, the executor is the residuary legatee, the law permits him to avoid the filing of inventories, the determining of assets, and accounting therefor to the probate court. But, if he so elects, he is required, personally, to guarantee the payment of all debts, just claims and damages recovered against the estate, including the satisfaction of legacies.[4] Otherwise,—there being no inventory and no duty to account—the creditors and legatees would be without means of having the extent of the estate determined. Accordingly, the special bond, which is given for the purpose specified, operates as an admission that there are sufficient assets and forecloses that question. The executor, in effect, assumes thereby the responsibility of payment to the full extent of his personal estate.[5]

■■■ The undertaking of a general bond, in contrast, is merely that the executor "will administer according to law and to the will of the testator all his goods, chattels, rights, and credits, and * * * in all other respects faithfully perform the trusts reposed in him." [6] Being thus responsible for the payment of debts and claims to the extent of assets collected only, and not to the full extent, as in the case of a special bond, it follows that there can be no action on a general bond until there is first determined the extent to which creditors can be paid from assets.[7] Under such circumstances, the proceeding for the collection of claims against the estate is against the executor in his official capacity to determine the amount of the demand sued on, the value of the assets in the hands of the executor, and the proration of the two.[8] The Code expressly provides the procedure by which this may be accomplished.[9] Thus, in an action against an administrator or executor the court is required to "assess the sum which the executor or administrator ought to pay, regard being had to the amount of assets in his hands and the debts due to other persons." [10] The executor is given an opportunity to plead insufficiency of assets.[11] If the court finds there are assets sufficient to satisfy all demands, the judgment is for the whole debt or damages found to be due; but "if it shall appear to the court that there are not assets to discharge all such just claims, the judgment shall be for such sum only as bears a just proportion to the amount of the debt or damages and costs, regard being had to the amount of all the just claims and of the assets" [12] and the court cannot make the required assessment, or pass judgment upon the claims until the time, limited by law or by the court for the executor to pass his account, shall have expired.[13]

■■■ Clearly, therefore, the provisions of Section 87 can have no application to the situation of the present case; there being no need, here, to determine the extent of liability, and therefore no need to afford the representative an opportunity to plead insufficiency of assets. It is significant, in this connection, that in an action against an executor unless such a defense, of insufficiency of assets, is interposed, judgment may be en-

[3] 2 Woerner, American Law of Administration, 3d Ed. 1923, 1170; 1 Id. 9.

[4] D.C.Code (1929) tit. 29, § 133.

[5] 2 Schouler, Wills, Executors and Administrators, 5th Ed.1915, § 1138; Lothrop v. Parke, 202 Mass. 104, 88 N.E. 666; 2 Woerner, American Law of Administration, 3d Ed.1923, § 202. See State v. Nicols, 10 Gill & J., Md., 27, 48.

[6] D.C.Code (1929) tit. 29, § 131.

[7] See Green's Adm'x v. Creighton, 23 How., U.S., 90, 108, 16 L.Ed. 419.

[8] See 3 Redfield, Law of Wills, 3d Ed. 1877, 94.

[9] D.C.Code (1929) tit. 29, § 252. In the District of Columbia, a claim is not barred even though not presented to the administrator or executor, or not passed by the probate court. See Clawans v. Sheetz, 67 App.D.C. 366, 92 F. 2d 517.

[10] D.C.Code (1929) tit. 29, § 252.

[11] Ibid.

[12] Ibid.

[13] Ibid.

tered for the full amount of the demand sued upon, and on such judgment "a fieri facias may issue against the defendant, and *either* his own goods or the goods of the deceased" may be taken and sold.[14] (Italics supplied) This demonstrates clearly the purpose of the action against the representative in his official capacity. No useful purpose would be served by requiring appellant to defend such an action first, and thereafter one in her personal capacity under the bond; she being liable for the full amount of all debts and lawful demands in any event. In this respect, there is no more reason for requiring an original action against her in her official capacity than for requiring, in the ordinary surety case, an action against the principal as a condition precedent to an action against the surety on the bond.[15]

 Our conclusion is supported by the decision and the reasoning of the Maryland Court of Appeals, in the case of State v. Snowden.[16] In defining the obligations of an executor who filed a special bond—pursuant to the Maryland statute, from which Section 87 of the District of Columbia Code was derived—that court, in 1836, said: "* * * By entering into such a bond he [the executor] becomes absolutely bound for the payment of all the debts of the testator, in the same manner as if they were debts due from him, in his personal, or individual capacity, and the bond differs in nothing, from a bond given for the payment of his own debts, except in that feature of it, which limits its operation, to debts, claims, and demands recovered against him as executor; his liability under it being confined to claims and demands against his testator, and damages recovered against him as executor, and not extending to debts, or demands due from him in his private, or individual right. In the recovery of his claim by suit, upon such a bond a creditor is not bound to shew assets. The want of them would be no defence to the action, if relied upon as such by the executor, and whether they ever

existed, or not, is a question with which the creditor has no concern."

Section 87 was derived from the Maryland Acts of 1720, Ch. XXIV. By the Organic Act of February 27, 1801, it became part of the law of the District of Columbia;[17] in 1901 it was enacted by Congress, in substance, and integrated in its present form, into the Code of the District.[18] While the decision in the Snowden case in 1836, therefore, does not have the same controlling effect as it would if the decision had been rendered before the law was adopted by the District in 1801,[19] it is nevertheless persuasive of the proper interpretation of the District statute.[20]

 The only witness called by appellee in the court below was one Balderston, who identified the signature and handwriting of both the testator and appellant. Objection to his testimony was made by appellant on the ground that it was based upon privileged communications between attorney and client. Balderston had been for many years testator's attorney and, for a short time after testator's death, he had been attorney for his estate. The objection was properly overruled. As we said in Tutson v. Holland:[21] "* * * The rule of privileged communications arose in order that a party might with safety completely inform his attorney as to the matters in which he is employed to the end that the attorney might act with full understanding of them. The limits of the rule, however, are well defined, and as its tendency is to stifle a full disclosure of the truth, courts have been careful to confine it within its legitimate scope, and so it has been held that the rule does not apply to the discovery of facts within the knowledge of an attorney which were not communicated by a client, though he became acquainted with such facts while engaged as attorney for the client."

Familiarity with the handwriting and signature of a client may be a matter not confidentially communicated by the client

---

[14] Ibid. See Fishel v. Kite, 69 App.D. C. 360, 101 F.2d 685, certiorari denied, 306 U.S. 656, 59 S.Ct. 645, 83 L.Ed. 1054.

[15] See Downer v. United States Fidelity & Guaranty Co., 3 Cir., 46 F.2d 733; 4 Williston, Contracts, Rev.Ed.1936, § 1276.

[16] 7 Gill & J., Md., 430.

[17] 2 Stat. 103, D.C.Code (1929), p. 449. See Comp.St. [D.C.] p. 8, § 19.

[18] 31 Stat. 1236.

[19] See Hartford Accident & Indemnity Co. v. Hoage, 66 App.D.C. 154, 85 F.2d 411.

[20] Hardenbergh v. Ray, 151 U.S. 112, 123, 124, 14 S.Ct. 305, 38 L.Ed. 93; Clawans v. Sheetz, 67 App.D.C. 366, 369, 92 F.2d 517, 520.

[21] 60 App.D.C. 188, 50 F.2d 338, certiorari denied, 284 U.S. 632, 52 S.Ct. 21, 76 L.Ed. 538.

to the attorney. While, perhaps, the attorney would not have become familiar with those matters except for the existence of the attorney-client relationship, clearly in this case the information was obtained collaterally to that relationship. Accordingly, it is well settled that such testimony falls outside the rule of privileged communications.[22]

As a further ground for reversal, appellant contends that Balderston learned of the facts relating to the present cause of action while acting as counsel for appellant; and that after terminating that relationship he joined with another attorney in bringing the present action on behalf of appellee. While it is true as a general rule that an attorney will not be permitted to assume a position hostile to a former client concerning the same matter as to which he formerly represented him, or to use against him knowledge and information acquired confidentially as his attorney,[23] that rule has no application to the present situation. In the first place, the objection is made for the first time on this appeal. Appellant at all times during the trial below had full knowledge of all the facts which she urges on appeal as a basis for reversal, and, except for the fact that she objected to his appearing as a witness for the purpose of identifying the signatures and handwriting of testator and appellant, which we have held was proper for him to do, she made no objection to his appearance. Under the circumstances, the lower court had no opportunity to rule upon the point and, in our view, whatever right she may have had to object has been waived.[24] Moreover, it is conceded that at some time prior to the trial, Balderston resigned from the bar and withdrew from the case as attorney. As we could do no more than require such withdrawal,[25] in any event, it follows that the granting of a new trial would serve no purpose. No objection is made to the integrity or conduct of the other attorney who appeared on behalf of appellee, other than that he was associated with Balderston at the time the action was instituted. That alone cannot be urged as prejudicial conduct requiring a reversal, particularly in the absence of an objection in the record.[26]

To secure the payment of the note here involved, the testator delivered to appellee twenty shares of stock. Attached to the note, and signed by the testator, is the following statement: "This statement witnesses that certificates of stock * * * are placed in the hands of Atty S. Hawley and Louise A. Hawley as security for my two notes one to Atty S. Hawley for $4300 [not here involved] and one to Louise A. Hawley for $2700, dated March 1, 1929. In case of my failure to pay these notes the stock becomes their property and when the notes are paid the stock is to be returned to me."

Appellant contends that the testator thereby intended the stock to become the property of appellee if the note was not paid, and that appellee, by accepting the note and stock, bound herself to accept the stock in payment of the note. It is contended further that by retaining the stock for more than eight years, appellee evidenced her intention to accept it in payment of the note. The contention cannot be sustained. Even attributing to the statement signed by the testator the meaning placed thereon by appellant, the clause providing for forfeiture of the pledged stock would be invalid and unenforceable. As was said in Haselden v. Hamer:[27] "* * * 'The pledgee is not entitled upon the pledgor's default to take the property as his own in satisfaction of the debt. A provision in the contract by which the ab-

[22] Johnson v. Daverne, 19 Johns., N.Y., 134, 10 Am.Dec. 198; Holthausen v. Poudir, 23 Jones & S. 73, 76, 55 N.Y. Super. 73; Hurd v. Moring, 1 C. & P., Eng., 372. In Brown v. Jewett, 120 Mass. 215, it was held that the trial court properly permitted the plaintiff to call as a witness the defendant's attorney, who was then engaged in the trial of the case, for the purpose of proving by him the signature of the defendant upon a note. See Oliver v. Cameron, MacArthur & M. 237, 244, 11 D.C. 237, 244, quoting 1 Greenleaf, Evidence § 245.

[23] Brown v. Miller, 52 App.D.C. 330, 286 F. 994. In re Boone, C.C., N.D. Cal., 83 F. 944, 952, and authorities there cited; Peirce v. Palmer, 31 R.I. 432, 77 A. 201, Ann.Cas.1912B, 181; Note, 51 A.L.R. 1307.

[24] Harvey v. Harvey, 202 Wis. 553, 560, 231 N.W. 580, 583. See Gottwals v. Rencher, Nev., 98 P.2d 481, 487.

[25] Cf. Peirce v. Palmer, 31 R.I. 432, 451, 77 A. 201, 210, Ann.Cas.1912B, 181. Cf. also, Brown v. Miller, 52 App.D.C. 330, 332–333, 286 F. 994, 996–997.

[26] Harvey v. Harvey, 202 Wis. 553, 561, 231 N.W. 580, 583.

[27] 97 S.C. 178, 184, 81 S.E. 424, 425.

solute property in the pledge is to vest in the pledgee upon default of the pledgor is void, and the pledgor is still entitled to redeem. Nor can the pledgee cut off the pledgor's interest in the collateral by a mere notice that if the debt is not paid by a certain time, he will take the collateral as his own.'"

This is the universally accepted rule.[28] While it is undoubtedly true that after the pledge is given, the parties may lawfully agree that the creditor shall take the pledge in satisfaction of the debt,[29] there was no such agreement in this case. On the contrary, appellant relies specifically upon the original agreement contained in the note. Under the circumstances, a default in payment of the secured debt gives the pledgee only a right to realize on it by some appropriate proceeding.[30] Mere delay on the part of the pledgee, in seeking payment of the secured debt, either by an action against the debtor or by foreclosing on the pledge, cannot have the effect of converting the pledge into payment of the debt which it was intended to secure, or of releasing the obligor from liability therefor.[31]

We have considered carefully all appellant's other contentions and find them to be without merit.

Affirmed.

---

[28] Neal v. Heinrichs, Mo.App., 259 S. W. 492; Alcolea v. Smith, 150 La. 482, 90 So. 769, 24 A.L.R. 815; Jones, Collateral Securities, 3d Ed.1912, § 554; Note, 24 A.L.R. 822, and authorities there cited.

[29] Alcolea v. Smith, 150 La. 482, 90 So. 769, 24 A.L.R. 815; Jones, Collateral Securities, 3d Ed.1912, § 555; Note, 24 A.L.R. 829.

[30] Mills v. Tiffany's, Inc., 123 Conn. 631, 640, 198 A. 185, 189.

[31] See Roberts v. International Bank, 58 App.D.C. 87, 25 F.2d 214; In re Hartranft's Estate, 153 Pa. 530, 26 A. 104, 34 Am.St.Rep. 717. See also, Cross v. Reid, 73 Cal. 302, 14 P. 885, 2 Am.St.Rep. 808.